## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE: EMERY JOSEPH FOX and                 4:05-bk-23707
      PENELOPE FOX, Debtors                          CHAPTER 7


INTERNATIONAL FIDELITY
INSURANCE COMPANY                                 PLAINTIFF

v.                      AP NO.: 4:06-ap-01012

EMERY JOSEPH FOX                               DEFENDANT


### AMENDED MEMORANDUM OPINION

The Memorandum Opinion dated December 8, 2006, is hereby amended to correct a typographical error on page 14. The opinion is otherwise unaltered.

Now before the Court is the *Complaint To Determine Dischargeability Of A Debt*, filed by International Fidelity Insurance Company (**"IFIC"**) pursuant to 11 U.S.C. § 523(a)(4) and an Answer filed by Debtor Emery Joseph Fox ("**the Defendant**" or "**Fox**"). Trial in this adversary proceeding was held on August 3-4, 2006. This is a core proceeding under 28 U.S.C. § 157(b), and the Court has jurisdiction to enter a final judgment in this case. The Court's findings of fact and conclusions of law are as follows.

### FACTS

The Debtor filed bankruptcy under chapter 7 on September 30, 2005. At the time of filing, Debtor was the president and owner of a construction company called Fox Construction Corporation (**"Fox Construction"** or "**Contractor**"). In the normal course of its business operations, Fox Construction required construction surety bonds in order to bid

upon, and be awarded, construction contracts.  In 2003, Fox Construction applied to IFIC for

a construction bond of credit.  As a condition of considering Fox Construction's application,

Fox Construction and Debtor, as indemnitors, executed and delivered to IFIC an Agreement

of Indemnity dated July 24, 2003 (the "**Agreement**"), which provided, in part, as follows:

## INDEMNITY

**SECOND:** The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind of nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.  Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor.  Such payment shall be equal to the amount of the reserve set by the Surety.  In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

## TRUST FUND

**FOURTH:** If any of the Bonds are executed in connection with a contract which by its terms of by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the contract or any authorized

extension or modification thereof; and further, it is expressly understood and declared that all monies due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

In reliance upon the Agreement, IFIC issued the following described bonds as Fox Construction's surety:

| Bond No. (Date) | Project | Obligee ("Owner") |
| --- | --- | --- |
| LR0326523 (07/24/03) | Water Line Relocation; Water Line & Accessories | Southwest White County Water Association, Inc. |
| LR0362091 (09/01/03) | Highway 412 Water Line Relocations | Western Greene County Regional Water District |
| LR0362113 (11/20/03) | Detonti Water Line Extension, Tull, AR | Town of Tull, Arkansas |

At trial, these construction jobs were referred to as: "**Southwest White County-Highway 64**", "**Western Greene County - Highway 412, Paragould**", and "**Tull-Detonti**", respectively. For purposes of brevity, they are referred to in this Opinion as: "**Highway 64**", "**Highway 412**", and "**Detonti**"; collectively, they are referred to as the "**IFIC jobs**". The Detonti Construction Performance Bond provided in Paragraph 1 the following:

The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract . . .

At Paragraph 8, the bond provided:

3

Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

Paragraph 15.1 defined "Claimant" as:

An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

Fox conceded in his testimony that as the Contractor, his company would not be considered a claimant. For the Highway 64 and Highway 412 jobs, Fox Construction and IFIC entered into "Arkansas Statutory Performance and Payment Bonds" which provided the following provision:

THE CONDITION OF THIS OBLIGATION is such that if the principal shall faithfully perform the Contract on his part and shall fully indemnify and save harmless the Owner from all cost and damage which he may suffer by reason of failure to do so and shall fully reimburse and repay the Owner all outlay and expense which the Owner may incur in making good any such default, and further, that if the Principal shall pay all persons all indebtedness for labor or materials furnished or performed under said Contract, failing which such persons shall have a direct right of action against the Principal and Surety, jointly and severally, under this obligation , subject to the Owner's priority, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

On behalf of Plaintiff, Genise Teich, senior managing claims counsel, testified that the bonds

4

do not cover general overhead expenses or principal owned equipment because the bonds are not for the benefit of the principal contractor.  She also identified Ark. Code Ann. § 22-9-401 as the relevant Arkansas statute describing what is covered by a municipal bond.  That Code section provides, in part:

> (a) All surety bonds required by the State of Arkansas or any subdivisions thereof by any county, municipality, . . . shall be liable on all claims for labor and materials entering into the construction, or necessary or incident to or used in the course of construction, of the public improvements.
>
> (b)      Claims for labor and materials shall include, but not be limited to, fuel oil, gasoline, camp equipment, food for workers, feed for animals, premiums for bonds and liability and workers' compensation insurance, rentals on machinery, equipment, and draft animals, and taxes or payments due the State of Arkansas or any political subdivision thereof which shall have arisen on account of, or in connection with, wages earned by workers on the project covered by the bond.

Fox Construction and the relevant Owners entered into written construction contracts for the IFIC jobs on or about the dates that the bonds were issued.  Fox Construction completed Detonti and Highway 64.  Fox Construction did not complete Highway 412; the Owner completed the work, and filed a claim with the Plaintiff for reimbursement.  Fox Construction ceased doing business in approximately June 2004, and its assets were liquidated at an auction held August 20, 2004.  IFIC subsequently received claims against the bonds from Fox Construction's project materialman, subcontractors and Owners, and paid on those claims the following amounts:

| **Project** | **Amount Expended by IFIC** |
|---|---|
| Southwest White County-Highway 64 Water Line Relocation | $32,048.74 |

| | |
|---|---|
| Western Greene County-Highway 412, Paragould Water Line Relocations | $256,106.41 |
| Tull-Detonti Water Line Extension | $68,059.80 |
| **Total** | **$356,214.95** |

It is undisputed that the Trust Fund *res* ("**trust *res***") is the amount of money paid by the Owners to Fox Construction on the IFIC jobs. In his Answer, Defendant identified the beneficiaries of the trust *res* as the materialmen, laborers and others who performed work on the construction project and were not paid from the trust *res* received by Fox Construction. Defendant further pled that no part of the trust *res* was used by Defendant to pay ordinary living expenses; however, the trust *res* was used to pay materialmen, laborers and those individuals and entities who performed work on the IFIC jobs, including Defendant, and the overhead expenses properly attributed to the cost of the IFIC jobs. Defendant also alleged that during the period of time work was performed on the IFIC jobs, Defendant liquidated a substantial portion of his assets and contributed the proceeds to Fox Construction, and that Defendant contributed more money to Fox Construction than he withdrew from the company during this period of time. At trial, both documentary evidence and testimony was introduced supporting these allegations, and Plaintiff raised a continuing objection to this evidence on the grounds of relevancy. The Court accepted the testimony and documentary proof with the caveat that it would be given appropriate weight. Because the outcome of this case does not turn on the Defendant's subjective intent in his use of the trust *res*, or the amount of money he may have paid into the corporation, this evidence is given little weight and will not be further described in this Opinion.

How Defendant expended the trust *res* is the deciding issue in this case. Defendant

6

Fox testified that he made the decisions as to who would be paid, and that he used the trust *res* to pay for labor, specifically the people they had to pay to try to finish the jobs. He testified that he did not use the trust *res* to keep the doors of the company open, but just to keep a particular job going. He testified that to stay in business in 2003 and 2004, he generally paid labor (so there would be employees), fuel, and those material suppliers that would not deliver materials unless paid. Through expert testimony by Certified Public Accountant Robert Winter, Defendant attempted to show a complete financial picture of Fox Construction during a ten month period from September 2003 through June 2004. To do this, Winter examined *all* of Fox Construction's costs and expenses, and allocated them to each of the IFIC jobs and to Fox Construction's other projects as a whole. Winter concluded that with the exception of the Highway 64 job (which still earned $4,382 even after all the adjustments he made), Fox Construction sustained large losses. Plaintiff, on the other hand, focused on the direct job costs which should be allocated to each IFIC job, and through its expert, Certified Public Accountant Bruce Engstrom, attempted to show that Fox Construction did not spend the entire trust *res* on expenses for which the Plaintiff as surety would be liable. Engstrom concluded that a total of $333,820 of job receipts were used on expenses other than direct job expenses on the IFIC jobs.

Both accountants began their analysis with an examination of Fox Construction's "**Job Detail Reports**." These reports allocated various expenses to each of the IFIC jobs under the following categories: materials, per diem (compensation for employees' out of

town expenses), equipment, miscellaneous, labor (including payroll taxes), burden, and fringes (fringe benefits).  Fox testified that the equipment category included insurance, maintenance, fuel, repairs, oil, and the general costs of ownership on the equipment owned by Fox Construction in addition to the cost of equipment rentals for equipment not owned by Fox Construction.  According to Fox, the charge for equipment was established in 1998 when it was purchased, and had never been updated to reflect any increased costs of operating the equipment.  Fox explained that "fringes" referred to some Simple IRA contributions for employees participating in a retirement plan.  The "burden" category was the subject of some dispute.  Fox testified that despite his prior deposition testimony in which he testified that the burden expense referred to home office overhead not directly chargeable to a job, it actually stands for items directly related to onsite labor such as health insurance, general liability insurance, worker's compensation, vacation time and holidays.  Engstrom testified that he did not believe this was a credible statement given that the total burden figure was 107% of payroll, and the insurance and worker's compensation figures did not come close to that, and that he also believed the payroll tax expense item included worker's compensation.  Fox testified that burden was a percentage that they had arrived at in 1998 to apply against labor costs to calculate the costs of worker's compensation, general liability, and health insurance for the employees.  Fox explained that he did not pull invoices for these items to arrive at the burden figure – it was just an estimate based on a percentage figure they came up with in 1998.  The following expenses were charged to the IFIC jobs according to the Job Detail Reports.

| Expense Category | Highway 64 | Highway 412 | Detonti | Total |
|---|---|---|---|---|
| Materials | $34,493 | $197,570 | $71,519 | $303,582 |
| Per Diem | - | 38,995 | 12,060 | 51,055 |
| Internal Equipment Costs | 23,012 | 50,344 | 103 | 73,459 |
| Equipment Rental | 107 | 22,177 | - | 22,284 |
| Miscellaneous | 573 | 6,423 | 3,040 | 10,036 |
| Labor | 19,236 | 70,498 | 24,118 | 113,852 |
| Payroll Taxes | 1,760 | 7,515 | 2,862 | 12,137 |
| Burden | 20,608 | 75,525 | 25,831 | 121,964 |
| Fringes | 176 | 500 | 3 | 679 |
| **Total Costs Charged to IFIC Jobs** | **$99,965** | **$469,547** | **$139,536** | **$709,048** |

For his calculations, Winter took the costs charged to the three jobs at issue, subtracted those invoices which were never paid, added certain costs inadvertently omitted by Fox Construction in its Job Detail Reports, and then made certain adjustments to items already allocated to the jobs, specifically to increase the amount charged for equipment owned by Fox Construction and for burden. In making the burden adjustment, Winter took into account the following expenses: payroll not allocated to specific jobs, payroll supervision, payroll tax expense, materials not allocated to specific jobs, small tools, supplies, worker's compensation insurance, other insurance, plans/blueprints, jobsite damages, pre-employment screening, safety programs, taxes, licenses, permits, per diem

9

travel not charged to jobs, uniforms, utility and telephone, employee health insurance, employer contributions to IRAs, and interest and finance charges. Winter then took other remaining expenses of Fox Construction which were not previously allocated to jobs and allocated them to the various jobs of Fox Construction; these were called "job support costs." The job support costs included: officer salaries, office salaries, payroll taxes, health insurance, employer IRA contributions, office rent, utilities, other insurance, office supplies and expenses. Finally, he allocated "general and administrative expenses" to Fox Construction's various jobs (*i.e.*, not just to the IFIC jobs). The general and administrative expenses included: the job support costs not allocated to IFIC jobs, advertising and promotion, building maintenance, employee gifts and benefits, entertainment, legal and accounting, bank charges/maintenance fees, telephone, interest expense, and state income taxes, less miscellaneous income. Winter concluded that with all these adjustments and all expenses allocated, Fox Construction sustained a loss of $79,794 on Highway 412, sustained a loss of $79,907 on Detonti, and made $4,382 on Highway 64. The chart below illustrates Winter's computations.

| | Highway 64 | Highway 412 | Detonti | Total |
|---|---|---|---|---|
| Costs Incurred Per IFIC Job Detail Reports | $99,965 | $469,548 | $139,536 | $709,049 |
| Less Open Vouchers Payable | (34,350) | (194,367) | (71,412) | (300,129) |
| Open Voucher Actually Paid | | 2,610 | | 2,610 |
| Equipment Charge Not Recorded | | | 54,336 | 54,336 |
| Bond Costs Not Recorded | 2,000 | 5,554 | | 7,554 |
| Equipment Adjustment | 9,348 | 19,902 | 21,967 | 51,217 |
| Burden Adjustment | 7,575 | 25,828 | 8,675 | 42,078 |
| Job Support Costs | 8,736 | 27,607 | 17,007 | 53,350 |
| **Total IFIC Job Costs Incurred** | **93,274** | **356,682** | **170,109** | **620,065** |
| General & Administrative Expenses | 11,952 | 48,398 | 21,543 | 81,893 |
| **Total with G&A Expenses** | **$105,226** | **$405,080** | **$191,652** | **$701,958** |
| **Total IFIC Job Receipts** | **$109,608** | **$325,286** | **$111,745** | **$546,639** |
| **Difference** | **4,382** | **(79,794)** | **(79,907)** | **(155,319)** |

11

On behalf of the Plaintiff, Engstrom determined which costs were properly allocated to each IFIC Job as costs that IFIC would be liable for as surety; he referred to these costs as "direct costs." He began with the costs charged to each job on the Job Detail Reports. He then removed those costs the surety would not be liable for; specifically, he subtracted the internal equipment costs, burden, and one $56 damage item on the Highway 64. He then determined which direct costs Fox Construction had actually paid by subtracting those costs listed on Fox Construction's Open Voucher Report. Engstrom next compared the direct costs paid by Fox Construction to the job receipts on each job and concluded that the job receipts exceeded the direct costs paid by Fox Construction. The following chart illustrates Engstrom's calculations.

|  | **Highway 64** | **Highway 412** | **Detonti** | **Total** |
|---|---|---|---|---|
| Costs Incurred Per IFIC Job Detail Reports | $99,965 | $469,548 | $139,536 | $709,049 |
| Less Internal Equipment Costs | (23,012) | (50,344) | (103) | (73,459) |
| Less Burden | (20,608) | (75,525) | (25,831) | (121,964) |
| Less Damage to Faucet | (56) | - | - | (56) |
| **Total Direct Costs** | **56,289** | **343,679** | **113,602** | **513,571** |
| Direct Costs Actually Paid* | 21,819 | 148,813 | 42,187 | 212,819 |
| **Total IFIC Job Receipts** | **109,608** | **325,286** | **111,745** | **546,639** |

| | | | |
|---|---|---|---|
| **Total Job Receipts Used on Other Than Direct Costs** | $87,789 | $176,473 | 69,558 | 333,820 |

*Direct costs paid in full included per diem, labor, and payroll taxes. Supplies, equipment rental, and miscellaneous expenses were not paid in full.

Engstrom also examined all of Fox Construction's expenses and found that 13% of the expenses paid were paid on the IFIC Jobs. He also examined Fox Construction's accounts payable and found that the company incurred obligations of $1,285,253 and paid $1,126,881 for a shortfall of $158,372. On the IFIC Jobs, however, Fox Construction incurred obligations of $399,094 and paid only $99,235 for a shortfall of $299,859. Based on these figures, Engstrom concluded that the IFIC Job receipts must have been used to pay other Fox Construction expenses.

Engstrom testified that he has extensive experience with contractors and subcontractors as an accountant and he has never seen the type of allocation used by Winter in the construction industry under either a cost plus or fixed fee contract, specifically referring to the allocation of overhead expenses to a particular job. The following testimony of Engstrom in his response to questions from opposing counsel on cross-examination clarifies the differences between the two accountants' approaches:

Q: Are you telling me that general and administrative costs are not part of the costs of a construction company?

A: Of a company, but not of a job.

Q: Of the company? They're the cost of --

A:  Yes, they are, but not of the job itself.

Q:  And they have to be included to determine whether or not the contractor made a profit on a specific job; is that not correct?

A:  That is not correct.

Q:  How could it not be?

A:  Because those are general and administrative that are taken to an [sic] account after you have figured your profit on a job, not before you figure the profit on a job.

Q:  So if you have a profit on the job, that is reduced by these expenses?

A:  To determine the overall profit of a company, but not for the profit of a job.

In sum, Engstrom's analysis determined which costs were properly allocated to the IFIC jobs and also covered by the bonds (*i.e.*, those costs that IFIC was liable for), while Winter allocated *all* of Fox Construction's costs to its jobs for an overall picture of Fox Construction's economic condition.

## ANALYSIS

Section 523(a)(4) of the Bankruptcy Code excepts from a debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  In this case, Plaintiff alleges that the Debtor committed defalcation while acting in a fiduciary capacity.  Plaintiff must therefore establish by a preponderance of the evidence: (1) that a fiduciary relationship existed between Plaintiff and Defendant; and (2) that Defendant committed defalcation in the course of that fiduciary relationship.  *In re Montgomery*, 236

14

B.R. 914, 922 (D.N.D. 1999). *See also Grogan v. Garner*, 498 U.S. 279 (1991) (adopting preponderance-of-the-evidence standard for all exceptions to discharge under 11 U.S.C. § 523(a)). If a defalcation has occurred, only that portion of the trust *res* inappropriately expended is nondischargeable. *See generally Matter of Thomas*, 729 F.2d 502 (7th Cir. 1984).

Whether a person is a fiduciary is a question of federal law. *Tudor Oaks Limited Partnership v. Cochrane* (*In re Cochrane*), 124 F.3d 978, 984 (8th Cir. 1997). Under prior case law in this district and in other bankruptcy courts, it is well-settled that the indemnity provision in the Indemnity Agreement at issue in this case creates a fiduciary relationship. *See In re Wright*, 266 B.R. 848, 851 (Bankr. E.D. Ark. 2001) (Scott, J.). In *Wright*, Judge Mary Scott interpreted an indemnity provision identical to the one at issue in this case, and held that the surety company had "demonstrated the existence of an express trust contained in a clause in the indemnity agreement . . . because it imposes the obligation upon the debtors to hold the funds in trust and that all funds due under the contracts are trust funds, identifies the *res* as the funds being paid pursuant to the construction contracts, and designates the materialmen and laborers as the beneficiaries." *See also In re Herndon*, 277 B.R. 765 (Bankr. E.D. Ark. 2002) (Mixon, J.) (Interpreting identical indemnity provision, court held that the express trust in the indemnity agreement created a trust relationship between the parties.). *See also In re McCormick*, 283 B.R. 680 (Bankr. W.D. Penn. 2002)*; In re McIntosh*, 320 B.R. 22 (Bankr. M.D. Fla. 2005).

Because the fiduciary relationship has been established, the issue in this case is solely whether Defendant committed defalcation in the course of that relationship. "Defalcation is

defined as the 'misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds.'" *Cochrane*, 124 F.3d at 984 (citations omitted). The Eighth Circuit further held in Cochrane that " . . . 'defalcation' does not require evidence of intentional fraud or other intentional wrongdoing." *Id.* Citing *Cochrane*, the Court in *Herndon* explained, "[a] failure to apply funds entrusted to a fiduciary in accordance with the terms of the trust is a defalcation, whether intentional or not." 277 B.R. at 769. *See also Wright,* 266 B.R. at 851 ("[A]lthough something more than mere negligence or an innocent mistake is required, ignorance of the fiduciary responsibilities is not an excuse to defalcation if that ignorance leads to a fiduciary default.").

Based on the above, the Defendant's subjective intent in expending the trust *res* is not an issue. Rather, the legal issue raised in this case is whether a defalcation occurs where the trust *res* is expended on job costs, but those costs are not costs for which the trust *res* was intended to pay (*i.e.*, non-trust beneficiaries were paid with job receipts). Plaintiff asserts that any use of the trust *res* for costs for which the surety is not liable constitutes a defalcation whereas Defendant asserts that he only has to show that he used the job receipts on actual job costs, but not necessarily on those costs for which the Plaintiff was liable as surety. Specifically, Defendant spent the trust *res* on the costs associated with equipment he owned, his burden, job support costs, and general and administrative expenses. Ultimately, almost every expense of the corporation was allocated to the IFIC jobs by Winter to show that the jobs were not profitable, and thus, that the trust *res* was absorbed by actual costs of Fox Construction.

16

Despite Defendant's assertions, it has been widely held that a defalcation occurs when the trust *res* is used on ***any*** purpose for which it is not intended.  In examining the meaning of defalcation under the recently enacted § 523(a)(4) under the Bankruptcy Code of 1978, Alabama's Bankruptcy Court reviewed the meaning of defalcation under section 17(a)(4) of the Bankruptcy Act.  There the Court stated:

> In Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510 (2d Cir. 1937), "defalcation" was placed in its historical context, without limiting the meaning to specific parameters. The Court rejected the notion that defalcation necessarily implies an embezzlement, fraud or misappropriation. While a defalcation may involve some misconduct, the Court concluded that the mere taking of money entrusted to a fiduciary is a defalcation. However, the Court further reiterated the position taken in In re Bernard, 87 F.2d 705 (2d Cir. 1937) that the act must be more than mere negligence or mistake.

> The district court in Matter of Kawczynski, 442 F.Supp. 413 (W.D.N.Y.1977) further reasoned that the meaning of defalcation in Central Hanover Bank & Trust Co. v. Herbst, supra, included "innocent defaults" and found that a diversion of funds held in trust for paying a supplier and a subcontractor to pay general business expenses created a debt that was not dischargeable in bankruptcy.

> In Carey Lumber Company v. Bell, 615 F.2d 370 (5th Cir. 1980) the Fifth Circuit questioned the continued validity of the dicta in In re Bernard, supra, that misappropriation may not be found on the basis of "mere negligence or mistake." Specifically, the Court concluded at p. 316 that,

> "Thus there is no requirement that a misappropriation must be shown to have been intentional in order to be covered by Section 17(a)(4)."

> The Court further rejected the contention "... that misappropriated funds must be shown to have been diverted by the bankrupt to his own use". At p. 376.

*In re Matheson,* 10 B.R. 652, 656 (Bankr. Ala. 1981).  Having reviewed the meaning of defalcation under the established law at that time (which remains unchanged today), the *Matheson* court concluded:  **"It is the mere act of using the trust fund for any purpose other than the purpose for which the trust was created that constitutes misuse or**

**misappropriation of the trust fund which is a defalcation committed by the fiduciary."**

*Id.* (Emphasis added.).  In reviewing more recent case law concerning defalcation under § 523(a)(4), this Court has found no deviations from this analysis.  *See e.g., In re Reeves*, 124 B.R. 5, 8 (Bankr. D.N.H. 1990); *In re Boshell*, 108 B.R. 780, 784 (Bankr. N.D. Ala. 1989); *In re Guy*, 101 B.R. 961, 992 (Bankr. N.D. Ind. 1988); *In re Ardito*, 1988 WL 324200, *3 (Bankr. E.D.N.Y. 1988); *In re Gans*, 75 B.R. 474, 490 (Bankr. S.D.N.Y. 1987) (all following *Matheson's* conclusion.).[1]

While more recent cases follow *Matheson*'s holding that any use of the trust *res* on on a non-trust purpose is a defalcation, in many of these cases, the facts are such that it is clear the debtor committed a defalcation by using the trust *res* on other construction projects, or to pay for the debtor's own lavish lifestyle, or simply to pay for the debtor's basic personal expenses.  Despite these types of facts, the case law discussed above clearly shows that such bad acts are not required to find that a defalcation occurred, but rather, use of the trust *res* to pay for anything other than the beneficiaries it is intended to benefit constitutes a defalcation. For instance, in *Wright*, Judge Scott stated:

---

[1]The only issue that courts do not uniformly agree on is whether negligence is enough to constitute defalcation, and that issue is not present in this case (no allegations have been made that Defendant was negligent in his use of the trust *res*, nor is Defendant's defense that he was merely negligent). According to Norton Bankruptcy Law and Practice 2d, "[n]ot all courts characterize defalcation as including purely negligent acts.  The Sixth and Seventh Circuits have held that a mere negligent breach of a fiduciary duty is not a defalcation.  Most bankruptcy and district courts which have considered the issue, however, find negligence sufficient to establish defalcation."  3 William L. Norton, Jr., Norton Bankruptcy Law and Practice § 47:29 (2d Ed. 2006) (*citing Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994); *In re Johnson*, 691 F.2d 249 (6th Cir. 1982)).

The debtors undertook fiduciary obligations when they signed the indemnity agreement and, thus, were required to hold the funds they received on their bonded contracts in trust for the subcontractors, laborers and materialmen with whom they contracted. When they received the funds, however, they paid some of their contract obligations, but also paid other debts, including personal expenses. In so doing they committed a defalcation. It is irrelevant that the debtors had no intent to deprive the subcontractors of their due, or that the funds were not expended on luxury items. It is sufficient that the express trust obligation was imposed upon them and that they breached that trust by spending the funds *outside of the trust responsibilities*.

*In re Wright,* 266 B.R. at 852 (emphasis added).  Likewise, a Bankruptcy Court in Kentucky concluded:

Ultimately, the Company experienced serious cash flow problems *and was unable to make payments to materialmen, laborers, suppliers and subcontractors on projects for which the company had received progress payments*. The Debtors have conceded that they failed to hold the funds for the benefit of *those entities*. This, without question, constitutes a textbook example of defalcation on the part of [the Debtors].

*In re Smith*, 238 B.R. 664, 674 (Bankr. W.D. Ky. 1999) (emphasis added).  *See also Matter of Kawczynski*, 442 F.Supp. 413, 417-418 (W.D.N.Y.1977) ("Although the funds were used for legitimate business purposes such as paying various overhead expenses, these payments nevertheless amounted to a diversion of trust funds under s 72 of the Lien Law."); *In re Ardito,* 1988 WL 324200, *3 (Bankr. E.D.N.Y. 1988) ("The debtor . . . argues that his acts were not for personal gain, but were for the benefit of the corporation which funded the pension fund, however, the mere act of using trust funds for any purpose other than the purpose for which the trust was created, however unintentional, constitutes a defalcation which renders the debt non-dischargeable.  *In Re Laverne E. and Betty A. Matheson,* 7 B.C.D. 643 (B.C.S.D.Al 1981). Another court has held that where an officer and major

shareholder of a corporation diverts money in order to keep his business alive such defalcation serves his personal purpose and, therefore, a resulting judgment debt is excepted from discharge by Sec. 523(a)(4). *In Re Tocci* 9 C.B.C.2d 636 (B.C.S.D.Fl 1983).").

Based on the Agreement, the bonds, and Arkansas law, it is clear that the trust *res* was for the benefit of materialmen, laborers, suppliers, subcontractors and owners who could make a claim against the surety on these bonds. That is why the bonds existed – for the benefit of these third parties. In fact, Article Fourth of the Agreement specifically provided, in part, that " . . . all payments received for or on account of said contract shall be held as a trust fund . . . , for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the contract . . .", and that " . . . all monies due under any contract or contracts covered by the Bonds are trust funds, . . . , for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, . . .". Further, even Defendant admitted in his Answer that "[t]he beneficiaries of the Trust Fund *res* are materialmen, laborers and others who performed work on the construction project and were not paid from the Trust Fund *res* by Fox Construction Corporation." Defendant also admitted in his Answer that "[t]he Trust Fund *res* was in fact used to pay materialmen, laborers and those individuals and entities who performed work upon the construction project, including defendant, and the overhead expenses properly attributed to the cost of the construction project." Any use of the trust *res* to cover the contractor's own expenses, whether that be the cost of using his own equipment, the cost of maintaining full-time employees expressed as "burden," or the contractor's overhead expenses, whether that be

20

expressed as "job support costs" or "general and administrative expenses," is a breach of fiduciary duty under the Agreement.  The Court further finds that the burden item cannot be allocated to the IFIC jobs as a direct cost (*i.e.*, a cost for which IFIC is liable) because it was not conclusively proven what expenses were represented by the burden figure.  Fox testified that burden was merely a percentage he had come up with in 1998 to cover certain costs, and Winter included a number of overhead costs in his adjustment for burden which would not appear to be directly related to the IFIC jobs.  For these reasons, the Court cannot determine whether burden is a direct cost that should be allocated to these jobs.

Fox through Winter's testimony was able to show that his company was not profitable.  There is no allegation nor any finding that Fox committed a bad act; however, as discussed above, § 523(a)(4) requires no such bad act, only a misuse of trust property.  That misuse occurred here because the trust *res* was sufficient to pay the direct costs incurred on these jobs but was not used accordingly.  Material suppliers and equipment rentals were not paid, and one job was not completed.  The Court finds that the amount of job receipts spent on non-direct costs as determined by CPA Engstrom are therefore nondischargeable in this bankruptcy case.  However, the Court makes two adjustments: (1) Winter testified that there was a cost of $2,610 that was listed on the open vouchers report on the Highway 412 job but was not listed on the Job Detail Report for that job, and therefore should not have been subtracted as an unpaid cost in Engstrom's calculations; and (2) it appears that under Ark. Code Ann. § 22-9-401(b), the Plaintiff should be given credit for those amounts expended

on bond premiums, two of which were omitted from the Job Detail Reports.[2] The calculation of what is excepted from discharge in Plaintiff's bankruptcy is as follows:

|  | Highway 64 | Highway 412 | Detonti | Total |
|---|---|---|---|---|
| **Total IFIC Job Receipts** | **109,608** | **325,286** | **111,745** | **546,639** |
| Less Direct Costs Paid | (21,819) | (148,813) | (42,187) | (212,819) |
| Less Unpaid Cost Omitted from Job Detail Report | | (2,610) | | (2,610) |
| Less Omitted Bond Premiums | (2,000) | (5,554) | | (7,554) |
| **Total Job Receipts Used on Other Than Direct Costs** | **$85,789** | **$168,309** | **69,558** | **$323,656** |

### CONCLUSION

For the reasons stated herein, a total of $323,656 of the debt owed Plaintiff is excepted from discharge in this bankruptcy case.  A judgment in accordance with this Memorandum Opinion shall be entered this date.

Dated: January 18, 2007

_____
HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

---

[2]It appears Plaintiff does not dispute that the bond premium is a direct cost in that Engstrom did not subtract the bond premium allocated by Defendant to the Detonti job on its Job Detail Report in determining which costs were direct costs.

cc:     Jack East III, attorney for Plaintiff
        Isaac A. Scott, Jr., attorney for Defendant
        Richard L. Ramsay, Ch. 7 Trustee
        U. S. Trustee